Case No. 17-3207, Doughty's Cafe et al. v. Illinois Gaming Board et al. Would the lawyers that are going to argue please step up and identify yourselves for the record? So are four of you going to be arguing? Yes, Your Honor. Okay. Good morning. Matthew Carter for the plaintiffs. Good morning. David Dahlquist on behalf of the plaintiffs as well. Good morning. Frank Biestjot on behalf of the gaming board. Frank? Yes. Could you say your last name again? Oh, Biestjot. Biestjot. Oh, all right. He said it's fine. I have a tough time. I apologize. Good morning. Kim Wahlberg on behalf of the interveners, Illinois Gaming Machine Operators Association, J&J Ventures Gaming, and Accel Entertainment. All right. So what we're going to do is allow both sides about 20 minutes for arguments today. From that, the appellants may save out some time for rebuttal. And so the two of you on each side have to decide how you're going to divide your time. All right? Okay. All right. So the rest of you may be seated. I believe, Mr. Carter, you're going to proceed. Yes, Your Honor. You may proceed. Thank you. And we would like to reserve two minutes for rebuttal if we could, please. All right. This case involves two overarching issues. One relates to the gaming board's authority with respect to the way it can regulate and take enforcement actions related to sharing of costs and expenses for advertising and promotions, and also ATM fees. So I'm going to cover that issue, and my partner, Mr. Dahlquist, is going to cover the issues related to our challenges to two specific provisions of the Video Gaming Act, one related to profit splitting and another related to dual licensure. So let me focus on the administrative rule. The circuit court found our claims related to the rule moot, and it did so incorrectly, and that's for at least three reasons. One, we have a live claim for fees under the Administrative Procedures Act. Two, we have a live controversy, and it's a controversy that the court found. Okay. How is it a live controversy if the gaming board voluntarily takes down the thing at issue? So how is that still live? It's still live, Your Honor, because it wasn't just the February 2017 policy that we were challenging. We were challenging the gaming board's authority to regulate issues related to cost sharing for advertising and promotions. So we didn't ask just for, in our complaint, we didn't ask just for the policy to come down. We also asked for declarations with respect to what is the board's authority to regulate these particular topics. So that's one reason why it's a live controversy. And then, of course, the fees is a totally separate issue that keeps the claim live. Did they say they weren't going to regulate that policy that was posted? No. All they said that they wouldn't regulate that particular policy, not that they wouldn't take the same actions that that policy announced that they would take action on. So your position is it's alive because you're challenging their ability to regulate in the future. That's right. And also because our clients, you have to remember – So doesn't that give us – aren't we sort of then in the advisory opinion area? No, Your Honor. Previously, before the 2017 policy, there was a 2014 policy. And while this is a kind of new industry, there's now been, I think, five or six different iterations of policies with respect to advertising and promotions. The board is constantly changing them. And it's our position that they don't have the authority to regulate how costs and fees, ATM fees, for example, and then advertising costs and expenses are shared in the first place. So if we get that relief, our clients are getting real relief because we don't have a constant threat of enforcement hanging over our heads. I mean, our clients, even today, have to go through audits on how they're interacting with their terminal operators with respect to sharing these types of fees and expenses. And basically what the board did in 2017 was say what was previously legal is now illegal and subject to enforcement actions. And they've never gone back and said what we used to say was legal is legal. That's why we have a problem. And it was a major problem for our business. And that's how we got here today. I mean, we brought our challenges to the policy and to the board's authority under several different theories. First, that the board had violated the APA. Second, that its action was without authority. Third, that it was arbitrary. And then we had constitutional challenges with respect to the rule as well. And I think even the board recognized that it had a problem, at least with respect to the APA. Why are you citing that, the fact that they took it down as their concession that it was wrong? That's clearly the concession that it's wrong. And that came about because of the Windy City Promotions case, which was the third district case, that dealt with a similar rule where the board took the rule down and then said, oh, well, this is a moot issue. And the third district said, no, it's not a moot issue. And that's the third reason why the claim is now moot, and that's the capable of repetition yet evading review policy exception. Although I don't know that you even need to address that, because the board would have to establish that the claims are moot to start, and I don't think they can do that. So let me briefly focus on the fees issue. In the circuit court, the gaming board actually conceded that our fees issue under the APA is not moot. They conceded it in writing. Now, the circuit court ignored that concession, but this court shouldn't. The key case on that issue is the Balmoral Racing case. And in Balmoral Racing, which is a Supreme Court's decision, it's from 1992, it's the most up-to-date presidential authority on this issue. The Supreme Court said that even a retrospective determination about the validity of a rule or administrative action presents a live controversy because it has real impact on the parties with respect to the fee provision. The APA fee provision, the Supreme Court has also said, is designed so that when a party like our clients find a doubtful rule, and that's what the Supreme Court has said, if a rule is doubtful, the fee provision is designed so that parties are incentivized to challenge that. And our clients had that incentive, and they did challenge it. They went through the effort and expense to file their complaint and bring this lawsuit. So in Balmoral Racing, that's the case that you should control, and at the very least, we should get a remand so that we can obtain our fees. Now, Balmoral Racing is also instructive on the live controversy issue. And I think there's two key cases on that. It's Balmoral Racing and Baker versus the Forest Preserve District. In both of those cases, in Baker, it was whether a Forest Preserve District could purchase a property out of mortgage, and then in Balmoral Racing, it was related to racing dates for the 1991 season. In Balmoral Racing, the Supreme Court didn't get the issue until 1992. And so, of course, they couldn't go back and award racing dates in 1991, and a party in the court said, well, that moots the claim. The court decided that wasn't the case because what the court could do is say, well, was racing boards, did it act beyond its authority? Did the way that it awarded racing dates fail under the Administrative Procedures Act? And if so, we can grant real relief because we can find what the racing board does in future seasons. It's the same in our case. It's the same in our case. If we get a favorable ruling and that our interpretation of the board's authority is correct, that provides meaningful relief for our clients. And that brings me to the last reason why our case isn't mooted, and that's the capable of repetition and evading review exception. That's the exception that the 3rd District used in Windy City Promotions. But your position is we don't even have to get to that. That's right. But if we had to get to it, then it would save your day. That's absolutely right. I think in Windy City Promotions, the court jumped right to that particular exception, but they didn't need to, and it's the same reasons that Balmoral Racing and Forest Preserve. So why is it capable of recurring? Because the board, I think, and if you look at their briefing, it's clear that they're taking the position that their interpretation is right and ours is wrong. So it's the board's position, as far as we can tell in this case, that whether there's no rule or a new rule or a different rule, they could take the same enforcement actions that they did or that they announced they were going to do in February of 2017. So you think that Mr. Ostrowski's affidavit saying they're not going to repost it, it doesn't do any good because the board could change their position. They could even change the makeup of the board. That's right. Administrators change. Enforcement agents change. Times change. And you can see, in this case, the capable of repetition and evading review is clear. I mean, the policy itself has changed six different times over the years. It's an industry that's only been here for four years. So, I mean, I think that the exception would definitely apply if you need to reach that issue. So those are the reasons, I think, that our claims on the administrative rule are not moved. Thank you. All right. We'll hear from Mr. Dahlquist now. Good morning. Good morning. May it please the Court. My name is David Dahlquist, and I will be addressing the two constitutional challenges to two provisions of the Illinois Video Gaming Act, specifically the profit diversion provision and the dual licensing prohibition. First, plaintiff's complaint has raised valid claims that these challenge provisions do not have a rational relationship to a legitimate state interest. Well, doesn't a state have an interest in regulating all of the gambling aspects of video gaming, the same as they would riverboat gambling or any other type of alcohol distribution? How does the state not have a rational basis to regulate that? The state absolutely has a basis to regulate that, Your Honor. However, that legitimate state interest, which I concede it does have, must be rationally related to the statute at hand. So is it the dual licensing provision that you think is overbroad or oversteps the government's position? We think both. The mandatory profit split of a 50-50 profit sharing after tax profits between an unrelated party, a third party here, the terminal operators represented by the interveners here today, that provision as well as the prohibition on dual licensing, both of them compounded, and created even more of an issue. How is that different than how they regulate alcohol? You have a distributor, a licensee, an operator. Those are three, and that's consistently been held to be rationally related to the state, while within their authority to do that. Absolutely, Your Honor. This statute and this act has nothing to do with alcohol. No, I get that, other than gamblers like to drink, but I get that. I'll concede that to you. But isn't the same policy in place? Like you have to split up so you don't get the vertical integration. Tell me why. Absolutely not, Your Honor. The Riverboat Gambling Act, which is the predicate to the Video Gaming Act, and the Video Gaming Act itself have those legitimacy of interest to prohibit and guard against corruption, bribery, et cetera. All of those are proper state interests. However, the Video Gaming Act itself sets out six different licensees in this system. The system that the terminal operators and interveners continually try to argue is that this is a three-licensee system. It's not. There's six. There's six different separate positions. There's manufacturers, distributors, terminal operators, locations, establishments, which are our clients. There are terminal license handlers. There's six different categories here. It's a very different statute, completely different, and we should not be looking to the gamblers. Isn't that just a reflection of a desire to highly regulate an industry that needs to be regulated? Certainly merits regulation. Absolutely. However, that regulation must be rationally related to that legitimacy of interest. What was the trial court's basic hinge upon which it found there was a rational related purpose? Certainly. The first one with respect to the 50-50 profit split found that that, in its judgment, was rationally related to corruption and bribery as well as economic concentration. We submit that neither is true. Our clients seek the freedom to contract, the freedom to be able to contract with a third party on their own profit split based on the dynamics of their own business. There's a wide disparity between the investment that is made by establishments, our clients, and the terminal operators. Establishments must scout retail locations, lease storefronts, build out and construct stores, hire staff, advertise to customers. Isn't part of that reasoning to kind of prevent one large conglomerate from controlling everything? No, Your Honor. We submit absolutely not. If that were true... Doesn't that squeeze everyone else out? There are different portions of the Illinois Video Game Act that control and speak specifically to that. With respect to economic concentration, 25I speaks specifically to that and addresses that. With respect to bribery and corruption, 25C speaks specifically to that, an inducement provision. Isn't this just another way of trying to control that possibility of bribery and other nefarious acts? I'll concede that the statute can have multiple ways to control that. However... And isn't it not... It's not our position to decide whether the way they're controlling it is the wisest way. No, but it is your position to decide whether the statute as written is rationally related to that legitimate state interest. And these two, which do not talk about bribery or corruption, do not talk about economic concentration, are not rationally related to those valid and legitimate state interests. An arbitrary selection of a 50-50 arrangement for two parties that are forced together by the state arbitrarily is not a promotion or an effort to discount bribery or corruption. In fact, I submit to you it's the opposite, that allowing the parties to be able to negotiate that profit split. How many companies right now are in the same position as your client? There are approximately 7,000 establishments across the state of Illinois. And how many are owned by a number of groups? Are there 7,000 separate operators? Is that what you're saying? No, Your Honor. There are a multitude of separate operators. Our clients, which are one of the larger, own 100 establishments across the state of Illinois. So there are a far greater number, but smaller in size. Are there limits on how many a corporation can hold? How many establishments? Yes. No, there's a limit as to the number of terminals that can be within a single establishment of five. But a business can't have more than one establishment, and our client's having 100. On the terminal operator side, we believe there's approximately 40 terminal operators in there. There is competition on both sides, and we would say that these scales are far greater on the terminal operator side as far as the size of the company. And we have, I detail a lot of this in our complaint, as to the size and the disparity of the negotiating there. That's what we're attempting to correct for. We're attempting to correct and allow our clients, the actual establishments who are there working directly with the patrons, and put in a sizable investment in order to allocate that through a free market system. What case do you think best supports your position that the two provisions you're focusing on are unconstitutional? Sure. Unfortunately, this is a nascent industry. You know, there's only four years of really law here, so there's nothing directly into this industry. Yeah, I understand that. We've cited cases in our brief related to the funeral home industry. Sure. Which in those... One was where the funeral homes were the only ones that could manufacture caskets. Correct. Correct. Correct. And then what's the other one? There was another funeral... Correct. Correct. Correct. Both of them are in that industry where, in that, the license structure that was set up was in order to protect, as the court found it, struck the licensure setup in both of those cases. You think those are analogous? We think they're analogous, Your Honor. And how? How are they? Because those licensure structures, as they were set up, was an economic favoritism, an economic protectionism of one group from somebody that didn't need protection. In those cases, they tried to argue that, well, only funeral homes should be able to sell caskets because otherwise these grieving people will need to or will be taken advantage of. Oh, the other case involved the extermination of animals, right? Correct. Correct, Your Honor. That's analogous, too. We do think, Your Honor. Again, it's an economic protectionism for one set of class of individuals for a fact that it's simply not occurring. If we go to the dual license provision itself, the circuit court upheld it based on, again, a rational basis, purported rational basis of bribery and corruption. But the stated basis was that he was afraid that if the plaintiffs here were seen opening up terminals in order to service them, that that would undermine public confidence in the ability to regulate gaming. That's a factual misstatement and a factual error because they do that today. One of the license structures that we talked about is a licensed terminal handler where establishments today can and do have that license, can open up their terminals, can access them in order to service them. It happens routinely. And for the circuit court to believe that that has undermined public confidence, if that were true, it would be happening today under the current structure. So that is a legal falsity. Under the Riverboat Gaming Act, which is the predicate to the Video Gaming Act, casinos and riverboat casinos can and do own their own machines and operate and service their own machines. We're asking for the similar type of treatment to occur here so that the disparity that currently exists where a terminal operator who, in our view, is really the epitome of a middleman, who despite the investment that is put in by our clients in order to invest in the economic opportunity that they have, the terminal operators merely purchase the machines from a distributor and then sell them or place them in an establishment. And for that, they are rewarded handsomely with a mandatory 50% after-tax profit take from our clients' coffers. Your Honor, the final point that I'd make with respect to the terminal operators is some of their arguments, some of their positions is that they are needed. They are a needed entity in order to help regulate bribery and corruption. We submit that that is not rationally related because they do not serve that function. There is a third-party monitor that is in place in the statute that is required to monitor the gaming throughout the state. It is real-time monitoring. They can shut down a unit or a system or a store at an instant basis if there is a suspicion of nefarious activity. Terminal operators do not serve that role. In fact, the statute prohibits them from serving that role. So the statute specifically excluded them from that conduct and that activity. We'll reserve the rest of our time for rebuttal. Thank you, Your Honor. All right. Here, I have one question. Please. Are there similar statutes like this in other states? That's a great question, Your Honor. Illinois is the only state of the union that allows video gaming. Not all states do allow video gaming. But the only state... The statute doesn't? I'm sorry. I'll finish my sentence and I might answer your question. The only state that has two bars, that one, it prohibits the establishment from owning their own machines and then also requires them to allocate a 50% of their after-tax profit to that entity. So we are unique and not in a good way. Thank you, Your Honor. Are you doing the mootness or are you doing the... I'm actually going to be doing both and then I'm going to reserve some time for my co-appellee to argue which is why I have this out just to keep track. May it please the Court. My name is Frank Gashot and I represent the Gaming Board. This Court should affirm the dismissal of plaintiff's claims because the multiple licensing restriction and the 50-50 profit sharing requirements satisfy rational basis review  Is counsel correct that Illinois is unique in this system? Pennsylvania, I believe, also has multiple licensing prohibition and has a set profit share. It's not 50-50. It's a different percentage. And I believe in Indiana and perhaps... Is that percentage favoring to the operators or to the... It's my understanding that it's the operators get roughly two to one over the establishments, although it's kind of a different situation there because the restrictions on what types of establishments are different than in Illinois and really what this gets to is that there's a broad array of ways to regulate video gaming and different states take different approaches. Would you agree that establishments have way more out-of-pocket costs than an operator? I'm not sure I would go that far, Your Honor. And really the point of the 50-50 profit share is to effectuate the anti-inducement provision. There are two sentences that are next to each other in Section 25C. And whether it's 50-50 or 60-40, whatever the number is, you still effectuate the state's purposes in the anti-inducement provision because if an operator could, instead of handing money to an establishment and saying, well, you know, I'll pay you $10,000, and they go, well, I can't do that anymore because the anti-inducement prohibition, if they could just instead structure a profit share agreement that favors the establishment. It's a very easy way around the anti-inducement prohibition. And plaintiffs do not challenge the validity of the anti-inducement provision. So the 50-50 profit sharing requirement is a critical part of the statute. So is there something arbitrary then about this 50-50? Well, I think it's just there's so in order to operate a video gaming location, it's a joint venture. That's what is required by the multiple licensing restriction. And so I don't know how the legislature got a 50-50, but there were two parties, and I think it just made sense. How is it rationally related if you can't really say the 50-50 is rationally related? Well, because there's two groups, and so they just split it down the middle. They evenly share the profits. They both jointly run the video gaming operation, and it makes sense just to split it down the middle. So what is your argument that having the split is rationally related to the purpose? It's rationally related to two primary purposes. One is maintaining public confidence in video gaming, which works alongside the anti-inducement provision to make sure that these sort of decisions are being made based on quality of service or types of games. There's a whole slew of reasons why an establishment could choose one operator over another. That's independent of whether they're receiving money. And the second important interest is preventing undue economic concentration among a handful of large operators, which, again, plaintiffs can see that that's a legitimate state interest. And although the Act also... Well, isn't that the primary reason that these provisions were put into place? I think it's both. I mean, that's one overriding concern of the statutory framework as a whole. It's important to remember that these provisions shouldn't be read in isolation. They're part of a larger statutory framework, which essentially divides the licensees. Well, I guess, again, everybody who participates in the video gaming industry... What are the dangers if a few have the concentration of all the machines, so to speak? Well, it would inhibit competition. It would perhaps make it harder to regulate. I mean, one of the goals of the... I mean, there are multiple goals with the Act. I mean, one of them was to raise revenue for the state. This was passed during 2007 when we really needed money for capital projects. So another way is to provide revenue for the establishments themselves. This is something that helps small businesses by making sure it's not concentrated. This isn't really what we're talking about today. Right. We're on a rational basis with you, which is very important. And so to the extent that plaintiffs argue that there are better ways to accomplish the state goals, that's not enough to establish there's no rational basis. That would be a strong argument if we were on strict scrutiny, but that's not the case here. And so the fact that some states do it differently actually shows that there are multiple rational ways to set up this sort of a structure. And here what the state has done is they've created... they've highly regulated just about everything that happens in this industry because of the unique situation of having a brand new industry that's displacing what had been an ongoing illegal operations. And so in broad strokes what the Act does is it divides up the operations into three groups. You have the manufacturers and distributors who make the machines, then they sell it to the second group who are the terminal operators who own the machines and service and maintain them. So they're in charge of the machines. And then the establishments are in charge of the location. And then by requiring... and what the multiple licensing restriction does, which is critical to the whole structure, because without the multiple licensing restriction, one party could own all the licenses. It could run the entire operation from building the machines through operating them and running the locations. Does the 50-50 profit margin also serve that same purpose? Oh, yes, Your Honor, because it... well, the 50-50 profit split is probably a byproduct of the multiple licensing restriction because once you have multiple licenses, you create a situation where you're going to have to have joint operation over a location. And so then the question becomes, what do we do with that? Based on the history of gambling, the legislature decided that to avoid situations where there's bribery or corruption or any of those concerns, we're just going to set exactly what the after-tax profits are. And so to the extent that plaintiffs in their brief have compared this to, you know, grocery stores, this is a very different situation. The state had very different concerns to deal with in this case. They were creating a whole new industry. And these provisions are consistent with the Act as a whole because it is a highly regulated industry. There are strict licensing requirements. And so there's nothing, I don't think, unusual about these provisions from what else exists throughout the Act. And I would like to turn now, I guess, to the... You know, I'm confused about one point. Sure. The 50-50 split. Yes. Where is there a rational basis? Well, there's two rational bases. The one is just to enforce the anti-inducement provision. Well, would you say that the legislature took the 50% out of the air? Well, no, Your Honor. I mean, there were, I mean, I don't have any legislative history about, you know, exactly why if they're debating 55 to 50 or something like that. But the purpose was just to set a number. 50-50 just seems, it seems like a rational decision. Does it require, if they're going to put 50% in there, that there be a rational basis for the 50%? There is a rational basis, Your Honor. I mean, the 50% number is just, I mean, you have two operators jointly operating a location, and so it just splits the profits down the middle. It's not favoring operators over establishments. It's not favoring establishments over operators. It's treating them exactly the same. And so that, I think, is a rational basis in and of itself. Well, if there wasn't any requirement of a profit split, what would that lead to, in your opinion, so that the regulation is rationally related? Right. If you got rid of the profit split, then you would have large terminal operators that can afford to provide more favorable profit splits, pushing out smaller operators that can't do so. And you would have essentially just a very easy end run around the anti-inducement provision, because the anti-inducement provision exists to prevent operators from providing financial inducements to establishments. And whether an operator does it directly by payment of money or just slightly more convoluted through the agreements of a favorable profit distribution, you still end up in the same place. And so if you strike the 50-50 provision, it really leaves the anti-inducement provision almost meaningless, I would say. And so I hope I answered your question, Your Honor. And I would like to then turn to the policy. If you need to determine a rational basis for 50-50, don't you have to consider the investments? And there are significant investments on both sides. Many of the establishments are pre-existing establishments, so you have to have a liquor license. If you already have a bar or a restaurant or whatever, this is just additional income. I mean, there are investments on the establishment side, but there are investments on the operator side, too. They have to buy the machines or lease the machines. They have to take on the costs of maintaining them. This is really a joint operation where you have to – What about the counsel's suggestion that the trial judge face this all on a flawed or faulty premise about keeping – making things look like, you know, someone that's in the establishment can open up a machine and start working on it? So that goes to the multiple licensing restriction, and I would say that there are numerous rational reasons for the multiple licensing restriction. One is the one that the court mentioned of the establishment employees opening up the machines and that could hurt confidence. That wasn't the only basis, then, that the court found that the multiple licensing provision was constitutional. And the court could have moved on to other ones as well, once it found that rational basis was satisfied. I mean, one of the critical components of this is that by requiring an operator and an establishment to jointly operate a gaming location, it creates a level of self-policing, which is especially important here because there are locations scattered throughout the state. Trying to oversee these tiny locations in every corner of the state is very difficult, which is why this is a fundamentally different situation from casinos where you have direct oversight and constant surveillance over what's going on. It was entirely reasonable and rational for the General Assembly to think, well, we actually need a level of self-regulation because it's going to be difficult to oversee all these different locations. And it works in a couple ways. For one, each licensee has incentives to report the other's misconduct because they have an obligation under the board's rules to report violations of the act. It prevents misconduct in the first place because you know that if you're going to rig the games, now not only do you have to hide it from the board, but you have to hide it from the other licensee. And in addition to that, the licensees have an incentive to do their due diligence and make sure that they're entering into a partnership with somebody who's trustworthy because if the other entity violates the act, that could jeopardize the entire operation. And turning very briefly to the policy because I'm running out of time, the challenges to the policy are removed because the policy no longer exists. But aren't they entitled to attorney's fees under that statute? It specifically says they're entitled to attorney's fees, so they make the allegation and you come back and you say, oh, here's an affidavit that says we're not going to do that anymore and we've taken it down. They've still expended fees, have they not? They have expended fees, Your Honor, but it's well settled that if there is no underlying controversy, courts should not decide that moot case just because attorney fees might be at issue. Wasn't one of their challenges that the procedures were not followed under the administrative code? Correct, Your Honor. Well, so why isn't that still a live issue? Why shouldn't they at least have a hearing on the acts that were done that are violating the statute? Isn't that one of their claims? Yes, it is, Your Honor. Why does it go away? Isn't there still a benefit to having the court determine whether or not the procedures that were used in this particular case were in violation of the administrative act? No, Your Honor, because there's no effectual relief that the court can provide on that substantive claim of whether or not the policy is valid. The court says this is not a way that this can be done in the future, but in addition, they are entitled to their fees on that issue? Well, if the court said this is not something that the board can do in the future, that would be an advisory opinion because it's not connected to an existing controversy. Also say this was something that couldn't have been done when it was done? I mean, isn't that? But there would be no relief on the substantive claim, because the only relief on the substantive claim that a court could provide is to strike down the policy, but there's no policy to strike down anymore. How do you distinguish it from the other case? Well, there's the Balmoral Racing case or Baker? Windy City. Oh, Windy City Promotions, okay. Well, Windy City Promotions was different for a couple of reasons. In Windy City, first of all, the court implicitly found that the claims were removed because it got to the exception of capable of repetition yet abating review. Here, what you have is we have the administrator's affidavit stating that the policy simply won't be reposted or relied upon in the future. But if you do that every time there's an allegation that you didn't follow the correct procedures, every single time, couldn't you just have the affidavit, oh, sorry, we won't do that again? Well, two answers, I guess, Your Honor. First is that courts have routinely given significant weight to agency statements of this nature, and secondarily, this is different from Windy City in an important way because in Windy City, there was a challenge to a policy, and during litigation on that challenge, the board took down that policy. And on that basis, the court was concerned that, well, once the litigation's over, the board's just going to repost it on the website. Here, the policy was not taken down in response to this litigation. It was taken down shortly after the Windy City decision was made. So it was just an example of an agency doing what it should do, which is respond. In this affidavit, wasn't there a request that the affidavit indicate that there would never be any enforcement of the policy that had been posted and that was refused? I don't think so. I mean, we said that the board will not rely on that policy to take any action moving forward. What plaintiffs are arguing is that they're saying that in order to establish mootness, the board would essentially have to say that they will never regulate in this area ever in the future, which goes well beyond what's required. And another reason, which is another reason why the capable of repetition, innovating review exception does not apply, because when the board does establish a new rule, there will be judicial review as a result of the APA procedure. This isn't a situation where courts would be unable to reach this issue. Is it capable of recurring then? I mean, aren't you sort of admitting that this is something that could come up again? Well, it first. Is there an exception to the mootness doctrine? Well, I don't think it would recur. I think it would fail both parts of the capable of repetition, yet evading review. It won't recur or be repeated because likely any new policy is not going to be identical to the old one. The board, whatever policy is challenged in a future proceeding is going to be different than the one they're challenging in this proceeding. So even to the extent that plaintiffs want guidance about certain things, a ruling about this policy might have little to no effect on the future one. But then it's also not capable of evading review because if the board goes through the APA procedures as they will, following Windy City Promotions, then you get judicial review that way. And then that's a better review, quite honestly, because then you're reviewing the actual policy that's at issue. And like the prior policy was multiple pages. I mean, there's a lot of little issues that could come up. So is Mr. Ostrowski's affidavit sufficient for this court to find that it's not capable? Because that's pretty much all you're hanging your head on, right? Is that affidavit saying, oops, sorry, we won't do that? Well, that affidavit, and it's supported by the circumstances of this case, that this isn't a situation where the policy was taken down in response to this litigation. It was taken down in response to judicial review. It was filed in this case, but the policy was taken down? Yes. So how do we know that it wasn't in response to this litigation that it was taken down? Well, because it was taken down very shortly after Windy City was decided. It just happened to be after the complaint was filed in this case. Well, Windy City was decided after the complaint was filed. I mean, this litigation was ongoing when Windy City was decided. And I think Windy City was decided on July 19th. The policy was taken down, or we made our mootness argument on September 27th. So we had some time to decide whether or not we were going to file a PLA from the other decision. But two months is pretty quick. All right. Anything further? Are we going to hear from Ms. Wahlberg? Yes. Good morning. Good morning. May it please the Court. Kim Wahlberg on behalf of the interveners. If it pleases the Court, I'd like to use my limited time to focus on what I think the Court is most struggling with here, and that's the 50-50, what we call profit sharing. I understand that plaintiffs have characterized it as profit diversion. That's a mischaracterization. On behalf of the industry, the terminal operators that I represent, we view this as a partnership. It's a true equal 50-50 split right down the middle. And we believe that that's why the legislature, to Your Honor's point, it was not arbitrary. They did not pull 50-50 after tax split out of the air. This was understood to foster a true partnership between different entities in the two tiers, the terminal operators and the establishments. And I'd like to speak specifically to the level of investment that the terminal operators have in this industry. So they have to purchase the video gaming terminals, which could run between $15,000 to $20,000 per terminal. They are constantly updating these terminals with additional software. It's important to note that the terminal operators, because of the 50-50 split, compete on service alone. They are not permitted to give an extra portion of the after tax profits to the location. There's any sort of an inducement to place their machines in those locations. And so the only way that they have to draw locations to contract with them is to make sure they're the best servicers and the best partners that they can be, and that often involves having the best machines. It's directed towards a joint venture, not a partnership. Judge, we would say, although again, the contracts, the use agreements specifically state, they do not create a joint venture in the formal legal sense. But it is a partnership in the sense of service partners working together. Again, there's no overlapping ownership between the two. There can't be. But it is a partnership in the sense of the terminal operators serve a designated role. They purchase, own, service, maintain the video gaming terminals, and the establishments host those terminals. And... You mean it's like a partnership. It's like a partnership, exactly. For all intents and purposes, it's a de facto partnership in terms of... What is the rational reason to come up with this number, 50-50? Yes, Your Honor. And I would say it's twofold. One, I don't believe this may be in the record, but anecdotally, our understanding is that prior to the legalization of video gaming in Illinois, there was an amusement industry practice, if you will. And in that practice, there was a 50-50 split between the providers of the machines, the amusement devices, and the establishments. And so, again, rational speculation here. The legislature did not spell out why they did this or how they did this, but they don't need to do that in order to pass constitutional muster. On the rational basis, we can use post hoc speculation. So it's possible, and it's certainly conceivable, that the legislature could have simply codified what was already a habitual practice. The whole idea behind having some sort of a split, whether it's 50-50, 60-40, is to implement the anti-inducement provision in the statute. Isn't that right? They go hand-in-hand, yes, yes. And certainly, because they appear in the same provision in the statute, I believe one right after the other, the logical inference there is that the 50-50 split is to ensure that there is no inducement by way of extra contractual profits. It's not so much the amount as it is the idea of having a set profit so that there isn't the possibility of violating the anti-inducement provision. Correct. We would submit that that's correct. However, if we could play this out, let's see if you did away with the 50-50 split and just allowed some other sort of floor or ceiling, or have you just opened, which we believe that's what the plaintiffs are advocating for, just opened negotiation in contractual terms of how the split would shake out. It runs afoul of another rational basis and another legitimate state interest, which is promoting and protecting small businesses from participating in this industry. Because you have larger, more well-resourced, capitalized entities like plaintiffs who are essentially mini-casinos, they can afford to give other locations that are independent 80% of the extra tax profits, and they take 20. Well, a small mom-and-pop terminal operator that's family-run, like some of the members of our association, can't afford to do that. They need the 50-50 split in order to continue to operate. And so they get squeezed out of the market, as I believe Your Honor had mentioned previously. How about the factor of responsibility? Is there a 50-50 split in responsibility towards those machines? I'm sorry, Justice, I didn't hear the question. Is there a 50-50 responsibility factor? Oh, absolutely. And again, it goes back to my initial comment, where we believe that we are operating as a de facto partnership, where we serve an equal role. Again, the terminal operators, in addition to providing the machines, are also responsible under the Act for serving as a gatekeeper. They collect the net terminal income. They remit the 30% portion to the state. And then they remit the remainder of the net terminal income, the 50% share, that goes to the establishment. They have to maintain a separate bank account for that purpose. I believe we stated in our briefs and offered evidence to the fact that the terminal operator application is almost three times the size of the location application. And the reason for that is because they're so much more involved. They have to establish necessary financing. They are vetted to the nth degree, and that goes to, obviously, preventing corruption in a previously illegal industry. You have establishments who were already there. They were already in existence. This was just to provide an additional revenue source for them. These terminal operators had to come from nowhere, because this was the first time that you had video gaming in Illinois that was legalized. And so they had to start from the ground up. So to your Honor's point, it definitely is an equal responsibility. Although they operate in separate spheres of the tiers, it is just as much investment, and they have just as much risk, if not more, and just as much at stake. Unless the panel has any additional questions for me on that point, I'd like to just remind the panel, obviously, the standard that we have here today, which is rational basis. The plaintiffs have the burden of demonstrating that there is no conceivable set of facts under which the challenge statutory provisions are rationally related. Judge Cohen found they didn't carry that burden, nor could they. And we believe they haven't done that, haven't demonstrated that they could do that here today. We're reviewing this, though, DeNovo. I'm sorry? We're reviewing this, DeNovo. Yes, you are. Yes, it's an issue of law. We'd like to point out that the plaintiffs had tried, before coming to court, in the legislation, I'm sorry, with the legislators, to amend not only the dual licensure provision to create a combined terminal operator location license, but also to do away with the 50-50 split, and that died in committee. So it's pretty clear the legislature is not, that the way that this was structured is consistent with a rational basis, and this is how the legislature intended this to play out. We would also like to point out that the dual licensure and shared profits provisions keep the Illinois video gaming industry clean, honest, competitive, and fair. And, again, these are the rational bases which we've articulated for both the dual licensure provision and the shared profits provision are apparent both in our briefs and in the discussions here today. And we'd ask that the dismissal with prejudice be affirmed. Brief rebuttal. Thank you, Your Honors. Two brief points, if I may. First, Your Honors are asking valid questions that we have a lack of a record. I heard the other counsel cite pure anecdotal evidence. We don't have a record. The court here prematurely dismissed this at a motion-to-dismiss phase. As a result, while there are important questions related to the legitimate state basis here, this court does not need to decide that question today, merely whether the complaint has alleged sufficient facts in order to allow the case to proceed forward. Your Honors, lots of questions that we don't have answers to because we don't have a record. But we went back to be able to develop that record before the trial court as well as before this court to proceed further. Second, on the 50-50 profit split, counsel mentioned that this is a partnership. This is the strangest partnership I've ever heard of where the state requires you to contract with a person and requires you to give them 50 percent of your profit. I've never heard of that type of partnership. A real partnership is where you're able to sit down at the freedom of contract, the partners are able to weigh the equities that they bring to the table, balance that out, and come up with a mutually agreed-upon contract. But this is in a highly regulated industry. This isn't like two people bargaining for something that they've decided they want to do together. It's just not the same. We're talking about an industry that's regulated because of the potential for corruption. I agree with you 100 percent, Your Honor, and that's why every single contract that is agreed to between a terminal operator and an establishment under 25E of the actual Video Game Act provision must be held on record and submitted to the state for review. The gaming board itself, who is here in this room, has the authority to review those contracts and accept or deny them. If they have concerns about that, that is where it is tempered. Not in this arbitrary, which they did pull out of the sky, Your Honors. If there was a prior anecdotal evidence, a 50-50 profit split while video gaming was illegal and that was codified in this statute, how in the world is an illegal arrangement afforded? I think there is one rational basis that you can point to as far as the profit split, and that is to ensure competition and not have some large conglomerate control all of these machines or vice versa. That ensures that there will be competition among people, the smaller businesses and the larger businesses. I concede that's a legitimate state interest, but we'll submit, and we don't have a record in order to display this entirely, but it is alleged in our complaint that the opposite has occurred. The conglomerates are on the terminal operator's side, certainly not on the establishment's side. We are asking for this to become a fair arrangement. The arbitrary provisions that have been put in the statute today are simply not fair. Let's let the freedom of contract govern that. Thank you for your time, Your Honors. All right. The case was well-argued and well-briefed, and this Court will take the matter under advisement.